219 So.2d 187 (1969)
Lezime J. TRAHAN, Plaintiff-Appellee,
v.
CENTRAL MUTUAL INSURANCE COMPANY, Defendant-Appellant.
No. 2588.
Court of Appeal of Louisiana, Third Circuit.
February 20, 1969.
Rehearing Denied March 12, 1969.
*188 Mouton, Champagne & Colomb, by George J. Champagne, Jr., Lafayette, and Voorhies, Labbe, Fontenot, Leonard & McGlasson, by J. Winston Fontenot, Lafayette, for defendant-appellant.
Broussard, Broussard & Moresi, by Marcus A. Broussard, Jr., Abbeville, for plaintiff-appellee.
En Banc.
SAVOY, Judge.
We have reviewed the record in the instant case and are in agreement with the written reasons for judgment filed in the record by the district judge. We hereby adopt his reasons for judgment, to-wit:
"This suit is a sequel to Edwards, et ux vs. Trahan, et al, 168 So.2d 365 (1964), Edwards vs. Trahan, 168 So.2d 369 (1964), and Edwards vs. Trahan, 168 So.2d 370 (1964).
"In the original suits plaintiffs obtained judgment against both defendants for approximately $75,000.00. The liability limit of the defendant, Central Mutual Insurance Company, was $25,000.00. These suits were settled for $50,000.00 after judgment with Mr. Trahan, the insured, contributing $25,000.00.
"In this suit Lezime J. Trahan seeks to recover from Central Mutual Insurance Company the amount he was forced to pay, i. e. $25,000.00, together with attorneys' fees incurred by plaintiff. Plaintiff alleges that he had purchased insurance coverage from the defendant to cover claims such as those urged in the three suits mentioned above, with a limit of $25,000.00; that the defendant denied any insurance coverage under the policy; that request and demand had been made upon the insurance company to provide defense in these lawsuits which it failed and refused to do; that offers to settle these suits within the policy limits had been made and refused; that as a result plaintiff paid the sum of $25,000.00 for which the defendant is liable together with the sum of $7,500.00 as attorneys' fees, alternatively, 30% of the sum recovered.
"Defendant denies that it is in any way liable and further contends that it fulfilled its obligation by providing plaintiff with a full defense and the offers to settle were declined because of a legitimate contention that the policy provided no coverage under the facts and circumstances of the case.
"This automobile accident happened September 30, 1962. Suits were filed December 31, 1962. As reflected by the letter of February 15, 1963 written by Nolan Edwards, on his behalf and on behalf of his wife, his brother and mother and father, to Mr. George Champagne, Mr. Frank Maraist and Mr. Gerald Hebert, all attorneys *189 representing the litigants, an offer was made to settle the several claims for $25,000.00.
"Promptly thereafter Mr. George Champagne, counsel for Central Mutual, was advised by Mr. Frank Maraist, attorney for Lezime Trahan, that should the settlement offer of Mr. Edwards be rejected and Mr. Trahan ultimately prejudiced thereby, redress would be sought against Central Mutual.
"The initial response of Mr. Champagne made it clear that he felt that there was questionable liability on the part of both Central Mutual and Mr. Trahan and, also, that he did not think Central Mutual was liable because the policy did not provide coverage. The first defense is premised upon the belief that plaintiff was negligent or, at least, contributorily negligent. The second is upon the premise that Mr. Trahan was engaged upon a business pursuit at the time of the accident so not covered by the policy. The policy is a comprehensive Homeowners Policy excluding accidents while in the furtherance of business pursuits, Special Exclusions, (a) (1). Throughout the correspondence, the last being dated May 4, 1964, Mr. Champagne steadfastly held to this position.
"Mr. Lezime Trahan testified that he could not recall all of the stages of this suit from the initial investigation until final judgment. This is quite understandable for this layman, or, as a matter of fact, for most laymen. He does recall going to talk with Mr. Champagne in the company of Mr. Maraist prior to trial. He can't remember if he told Mr. Champagne directly or if it was Mr. Maraist but he did agree to put up a sum of $7,000.00 to $10,000.00 in order to settle. This was never consummated because of Mr. Champagne's refusal to do so. His discourse with Mr. Champagne is as follows:
"`Q. Lezime, at the time of the conferences you referred to in Mr. Champagne's office, when Mr. Maraist was present; Mr. Maraist was there as your attorney, is that right?
"`A. Well, Mr. Champagne told meif I'm not mistaken, before I got Mr. Champagne, Mr. Maraist, he told me, he said, "You don't have no insurance."
"`Q. Mr. Champagne told you that?
"`A. Yeah. Mr. Champagne said, "You don't have no insurance."
"`Q. Where did he tell you that; do you remember where it was?
"`A. I don't remember exactly where we was when he told me that but he talked to me and he said, "You don't have no insurance." He said, "I advise you to employ or get you a lawyer." He said, "I can't defend you." Well, I say, "I thought when I had insurance, the lawyer, insurance supposed to carry me." He said, "No." He said, "You don't have no insurance. The best thing to do is get yourself a lawyer." So that's when I went and see Jerry Hebert. Then Jerry Hebert got Mr. Frank Maraist and that's when I took Frank to do my work. And I left everything up to Frank, to do the work.'
"Mr. Trahan also stated that he heard Mr. Maraist tell Mr. Champagne that he was going to sue the insurance company, to which the reply was, `That's your business. Sue if you can.' but, `I'm not going to settle.'
"Mr. Maraist testified. He stated that he would not represent Mr. Trahan until he realized that a judgment in excess of the policy limits was indeed a possibility. He spoke with Mr. Champagne on at least four occasions with a view towards settlement within the policy limits. He advised Mr. Trahan of his vulnerable position. He opined that all were pretty well in agreement that Mr. Trahan was negligent. It was pointed out to Mr. Champagne that some of the plaintiffs were guest passengers and would not be contributorily negligent even if the driver, Nolan Edwards, was found to be negligent, which he thought remote.
"On the day of the trial he again conferred with Mr. Edwards and Mr. Champagne *190 and learned that the $25,000.00 offer of Mr. Edwards was still good and, at that time, told Mr. Champagne that Mr. Trahan would pay $8,000.00 toward a $25,000.00 settlement. This is corroborated by the testimony of Mr. Edwards. Mr. Champagne's reply, as he recalls it, was "I have no authority.'
"Mr. Maraist also demanded that Central Mutual supply Mr. Trahan with a defense. Mr. Champagne represented Mr. Trahan in the liability feature of the suit but did not supply a defense on the non-coverage feature. As a result of the position taken by Central Mutual he was employed and remained so throughout the trial.
"Mr. Maraist admits that a vigorous defense was made but he felt all along that his client was going to be `hung' for a substantial judgment.
"Mr. George Champagne testified on behalf of the defendant. He had served as its counsel in the three Edwards' suits above-mentioned and is now co-counsel along with Mr. Winston Fontenot for the defendant in this suit. He stated that he represented Central Mutual only insofar as policy coverage was concerned but, as to negligence, contributory negligence and quantum, he represented both Central Mutual and Mr. Trahan.
"At the time he first received the offers of settlement from Mr. Edwards and the letter of February 20, 1963 from Mr. Maraist, he had not completed the investigation of the case. He handled the defense of the case as to liability as Counsel in Chief, with Mr. Maraist there beside him at trial counsel's table throughout. He stated that Mr. Maraist said to him in private that he, Mr. Champagne, had handled the defense as well as anyone could have. This is not denied by Mr. Maraist.
"Mr. Champagne recalls a discussion between Mr. Edwards and himself, in the presence of Mr. Maraist, in the anteroom of the courtroom on the day of trial which went like this:
"`And as is usually the case in all cases, attorneys talk to each other and whatnot and Mr. Edwards was there and Mr. Maraist was there and myself. And Mr. Edwards again offered to me to settle the case for my policy limit of twenty-five thousand ($25,000.00) dollars, in the presence of Mr. Maraist. And I simply told Mr. Edwards, in the presence of Mr. Maraist, that on the basis of my appreciation of the entirety of the situation and my instructions from my client, based, of course, on my recommendations, was that there was no coverage and that I had no authority to pay him this twenty-five thousand ($25,000.00) dollars; and that my position of non-coverage had not changed.'
"And, further, he said:
"`Now, I don't recall whether Mr. Edwards remained in the room or didn't or not, because, frankly, this took place quite a long time ago and I've sat and I've tried to recollect as best I could. Mr. Maraist suggested to me that Mr. Trahan might be prepared to pay a part of the proposed twenty-five thousand ($25,000.00) dollar settlement and would my company pay a part. And I told Mr. Maraist again, Ithat the only answer I could give him was what I had given Mr. Edwards. And that on the basis of my instructions, I had no money with which to make any kind of a payment and thus had no authority to offer him anything for I had nothing to offer. But I asked Mr. Maraist, I said, "What willWhat will Mr. Trahan pay?" He said, "Well, I don't know, I'll have to talk to him." Mr. Trahan was not in the anteroom. Mr. Trahan was seated in the Courtroom. Now, these conversations were taking place among myself and Mr. Maraist and I don't think Mr. Edwards was necessarily in the conversation. He may have even left the anteroom by that time. These conversations were take placewere taking place while the Court was in session and the preliminaries were going on, defaults, et cetera, *191 et cetera; and, after a whileAt the time that I asked Mr. Maraist, I said, "Well now, what will Mr. Trahan pay," and he told me, "I don't know. I'll have to talk to him." At that time, our case, the Edwards' cases were called for trial. We left the anteroom, we came into this Courtroom, and we proceeded to trial; and that's the last I've ever heard of it.'
"Mr. Champagne denied that he was ever given a figure as to the amount which Mr. Trahan would contribute towards settlement.
"Upon cross-examination he vehemently denied that he arbitrarily decided that it was no use to call Central Mutual about the last minute offer in the anteroom on the date of trial. He admits that when he recommended that the $25,000.00 settlement offer be rejected that he did so as Mr. Trahan's lawyer, as well as Counsel for Central Mutual, because of his belief of non-coverage coupled with questionable liability.
"The District Court held that the sole and proximate cause of the accident was the negligence of Lezime Trahan in operating his tractor at an extremely slow rate of speed on a well traveled highway, and hauling a trailer with a huge stack of hay which was completely devoid of lights, reflectors, or signals of any kind. It also held that Nolan Edwards was free of contributory negligence. The Court further concluded that the policy did afford coverage as the facts established that Mr. Trahan was on a personal mission not connected with any business pursuit.
"The Third Circuit Court of Appeal affirmed the lower court's holdings in all respects. The Court reviewed the evidence in detail in concluding that the activities of Lezime Trahan were of a non-business nature so it will be unnecessary to review them here.
"Counsel for plaintiff argues very forcefully that a defense in the Edwards' suits as to liability vel non was almost nonexistent. He argues that counsel for Central Mutual knew of this and should have recognized the futility of this defense. He says the only real defense which may have been offered was the defense of non-coverage under the terms of the policy. Yet, as it turned out, this was also not a valid defense. This, he argues, should have been recognized by counsel for Central Mutual and, in not doing so, acted arbitrarily and unreasonably.
"Counsel for Central Mutual argues just as forcefully that the matters of the previous defenses and actions should be considered in the entirety, not piecemeal, in order to determine whether or not Central Mutual was arbitrary and unreasonable. He contends that these acts, at the outset, were serious and in good faith both as to its position concerning liability and non-coverage and, therefore, should not be held responsible for the payment of the excess paid by Mr. Trahan nor the attorneys' fees he may have incurred.
"Counsel for plaintiff has cited the case of Roberie vs. Southern Farm Bureau Casualty Insurance Co., [La.App.], 185 So.2d 619 (1966), wherein the court allowed recovery of a plaintiff against an insurance company for the amount he paid in excess of the policy limits. The First Circuit Court of Appeal concluded that there was liability because of negligence, upon facts distinguishable from the instant case, but allowed a credit for the sum actually offered towards settlement by the insured and denied attorney's fees. However, a writ was granted by the Louisiana Supreme Court to review only that part of the Court of Appeal judgment reducing the $7,000.00 award by $2,000.00. The Supreme Court, Roberie vs. Southern Farm Bureau Casualty Insurance Co., 250 La. 105, 194 So.2d 713 (1967) reversed the Court of Appeal insofar as it reduced its judgment by the amount offered by the plaintiff. The Court stated, however, that `We agree with the Court of Appeal that there was no bad faith on the part of the Insurance Company in not compromising *192 the claims filed against it in the Pitre case [Pitre v. Roberie, La.App., 117 So.2d 74]. It acted within the terms of its insurance contract in proceeding to trial, and, under the facts supra, its action could not be considered arbitrary, i. e., it preferred litigation to compromise.' (Underscore added.)
"In Younger vs. Lumbermen's Mutual Casualty Company, [La.App.], 174 So.2d 672 (1965), the Court reviewed the juris- of the State of Louisiana, observing, at that time, that only four cases have touched on the question where similar facts were involved, New Orleans & C. R. Co. vs. Maryland Casualty Co., 114 La. 153, 38 So. 89, 6 L.R.A.,N.S., 562; Wooten vs. Central Mutual Ins. Co., La.App. 3 Cir., 166 So.2d 747; Stewart v. Wood, La.App. 1 Cir., 153 So.2d 497; Davis vs. Maryland Casualty Co., 2 Cir., 16 La.App. 253, 133 So. 769. Those cases have indicated that an insurer may be held liable for the excess of the policy limits where the insurer's failure to accept an offer of compromise is arbitrary under the circumstances.
"In the Younger case Judge Tate, in his usual scholarly manner, discusses the standard of conduct by reason of which the insurer might become liable for the excess of policy limits and cites at length portions of a discussion at 7A, Appleman, Insurance Law and Practice. There it states:
"`It is not sufficient for the insurer to consult its own self-interest. As a professional in the defense of suits, it must use a degree of skill commensurate with such professional standards. As the champion of the insured, it must consider as paramount his interests, rather than its own, and may not gamble with his funds. Its relationship is somewhat of a fiduciary one, and the liability is greater than indicated by some of the earlier holdings. Thus, if the insurer refuses to settle a claim because it believes that the insured is not liable, it is nevertheless answerable for such refusal if its belief was arbitrary or capricious.'
"`Again, the treatise summarizes the standard of the insurer's duty as follows, Section 4712 at p. 562: "Some courts, in weighing the responsibilities of the liability insurer, speak of bad faith; some speak of negligence; others use the two terms interchangeably. And, in truth, they are to some extent interchangeable. The insurer, as a professional defender of lawsuits, is held to a standard higher than that of an unskilled practitioner. What might be ignorance in his instance may be unforgivable oversight of the insurer; what might be neglect in his instance could well constitute bad faith on the part of the insurer. The question is always: `Did the insurer exercise that degree of skill, judgment, and consideration for the welfare of the insured which it, as a skilled professional defender of lawsuits having sole charge of the investigation, settlement and trial of the suit may have been expected to utilize?' If it did, there is no problem; it is not liable. If it did not, then a court could easily describe its conduct as being negligent, or as not in accordance with the high duty of good faith which it owed to its insured."'
"Noted in the American Trial Lawyers Association news letter of March, 1968, is a discussion of this problem, citing a leading California case, namely, Crisci vs. Security Insurance Co., [66 Cal.2d 425], 58 Cal.Rptr. 13, 426 P.2d 173 (California Supreme Court 1967). This case is not controlling here in Louisiana but does contain pertinent language.
"In the Crisci case a suit was filed against the insurance company because the plaintiff had suffered a judgment in a personal injury accident after her insurer had refused to settle within the policy limits. The Court there stated, in citing other California cases, the following rule:
"`* * that in every contract, including policies of insurance, there is an implied covenant of good faith and fair dealing that neither party will do anything which will injure the right of the other to receive *193 the benefits of the agreement; that it is common knowledge that one of the usual methods by which an insured receives protection under a liability insurance policy is by settlement of claims without litigation; that the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose the duty; that in determining whether to settle the insurer must give the interests of the insured at least as much consideration as it gives to its own interests; and that when "there is great risk of a recovery beyond the policy limits so that the most reasonable manner of disposing of the claim is a settlement which can be made within those limits, a consideration in good faith of the insured's interest requires the insurer to settle the claim." ([Communale v. Traders & General Ins. Co.], 50 Cal.2d [654] at p. 659, 328 P.2d [198] at p. 201.)'"
The defendant in the Crisci case attempted to justify its rejection of the settlement by contending that the plaintiff had no chance of winning. In upholding the trial court's finding for the plaintiff, the Supreme Court said:
"`The trial court found that defendant "knew that there was a considerable risk of substantial recovery beyond said policy limits" and that "the defendant did not give as much consideration to the financial interests of its said insured as it gave to its own interests." That is all that was required * * *.'
"The entire records of the three Edwards' suits have been introduced into evidence. The statement of Mr. Lezime Trahan, given October 24, 1962 to an insurance adjuster and in the presence of his attorney, Mr. Allen Gremillion, stated that he had purchased 205 bales of hay, had loaded it on a trailer and was towing it along the highway toward his own premises when the accident occurred. This statement is clear to the effect that he, on occasion, would purchase hay at the rate of 5¢ per bale and then resell it at a profit which, clearly, is a business pursuit. In this statement there is no mention made as to the personal use intended of this particular load of hay.
"This statement, taken alone, would certainly lead Mr. Champagne or anyone else to believe that Mr. Trahan was engaged at the time of the accident in a purely business pursuit.
"However, Mr. Trahan's deposition was taken January 26, 1963, prior to the answer of Central Mutual, wherein Mr. Trahan stated that he had purchased the hay for his personal use; that he was taking the hay to his home and the transportation had nothing whatsoever to do with his employment to cut the hay for another that day; that it was being transported to be stored on his premises for consumption by 10 head of cattle kept for personal use by himself and his household.
"In view of these statements by Mr. Trahan, made prior to answer having been filed and while the matter was being investigated by Central Mutual, there seems to be a clear indication that the position of Mr. Champagne was one which should have been re-evaluated as there very well may have been differences of opinion. As it turned out, there were many who differed, including the trial and appellate judges. Mr. Champagne is not an attorney of mean ability and, indeed, has had considerable experience in representing this and other insurance companies. Is this, then a situation where he should have recognized that the court might hold that there was insurance coverage and Central Mutual could be held for the damages occasioned by the negligent operation of Mr. Trahan? Also to be considered is the serious injuries sustained by Mr. Edwards and the other occupants of his automobile which should have alerted Mr. Champagne to the fact that if there was judgment it could very well have been in excess of the policy's limits.
*194 "Considering all of this, was the position taken by Mr. Champagne unwarranted? I want to make it clear that I do not for an instant even remotely believe, nor infer, that Mr. Champagne acted in bad faith. Courts have held that bad faith is the equivalent of dishonesty, fraud and concealment. I have known Mr. Champagne for almost a score of years and his character as a man is beyond reproach. He is neither dishonest nor does he practice fraud and there has been no concealment by anyone in this case.
"However, I do believe, taking this case not piecemeal but in its entirety, that Central Mutual did not act in the most reasonable manner expected under the circumstances. With all of the facts at hand the defendant knew, or certainly should have known, that there was indeed a likelihood of judgment being rendered in plaintiff's favor in a sizeable amount, far above the limits of the policy. Central Mutual was placing blind faith in its belief in non-coverage under the policy. It had the opportunity to settle well within the policy limits but chose not to do so. This it should not have done under the circumstances as it was placing its interest above the insured's.
"As to the negligence and the contributory negligence, this defense was even weaker. It was almost hopeless to believe that Lezime Trahan would be held free of negligence and, even if the driver was negligent himself, the guest passengers would probably not be held contributorily negligent. Mrs. Agnes Edwards, one of the passengers, was severely injured and received an award of $30,000.00, this alone being in excess of policy limits.
"In reaching this decision I have allowed the deposition of Judge Domengeaux to be admitted in evidence, so have read and considered it in its entirety.
"For these reasons judgment will be rendered in favor of plaintiff, Lezime J. Trahan, and against defendant, Central Mutual Insurance Company in the amount of TWENTY-FIVE THOUSAND AND NO/100 ($25,000.00) Dollars, plus interest from date of judicial demand and all costs.
"Since the conclusion is that there was no showing of bad faith, attorney's fees will be denied. Roberie vs. Southern Farm, supra. When the Supreme Court of Louisiana granted the writ to review the decision of the First Circuit Court of Appeal in that case, Roberie vs. Southern Farm Bureau Casualty Co., 249 La. 483, 187 So.2d [450] (1966), it did so on a limited certiorari which did not include a review of the denial of attorney's fees. The decision of the Court of Appeal in that respect should be followed. * * *"
For the written reasons assigned the judgment of the district court is affirmed at appellant's costs.
Affirmed.
CULPEPPER, J., dissents and assigns written reasons.
HOOD, J., dissents for the reasons assigned by CULPEPPER, J.
CULPEPPER, Judge (dissenting).
In my view, a reading of the record and our decision in Edwards v. Trahan, 168 So.2d 365 (3rd Cir. 1964) shows that Central Mutual had reasonable cause to believe its coverage defense would be successful. Under the circumstances, it was not arbitrary or capricious in refusing the compromise.
In Edwards v. Trahan, supra, the facts showed that Mr. Trahan owned tractors, a hay baler and other equipment which he used in his business of baling, storing and selling hay. He had facilities to store as much as 14,000 bales for sale to farmers. On the occasion in question, Trahan had been baling hay for a farmer-customer. He had 205 bales on his trailer and was proceeding toward his home, where his hay storage barns are located, on the night of the accident.
The record in Edwards v. Trahan shows that within a few days after the accident *195 Mr. Trahan gave a statement to Central Mutual's adjuster. He stated he had purchased the 205 bales of hay from his farmer-customer and was hauling them to his storage barn for resale to other farmers. Of course, under these facts, Trahan was engaged in a "business pursuit" and coverage under Central Mutual's "Homeowners Policy" was excluded.
However, after Trahan learned of the coverage question he changed his story. He testified in a pretrial deposition and at the trial that he had purchased the 205 bales of hay for his personal use and not for resale. Trahan owned only 10 cows used for milk and beef production for his family. He said he was going to feed this particular 205 bales to these 10 cows.
In my view, there was sufficient evidence for the trial judge to reasonably conclude that Mr. Trahan's statement to the adjuster, given at an unsuspicious time, was true and his later testimony was false. It was a question of Trahan's credibility. It could have gone either way.
The best evidence of the seriousness of the coverage question is the testimony of Judge Jerome Domingeaux, the trial judge in Edwards v. Trahan, supra, who testified in a deposition in the present case as follows:
"Q. Judge, in view of the evidence that was introduced at the trial, concerning the facts of the case and also the policy of insurance, which was introduced and made part of the record, did the coverage problem of this particular policy involved involve any consideration on your part in reaching your decision one way or the other?
"A Very definitely. There's no question but that there was what I considered to be a serious question on coverage and I resolved it finally by ruling that there was coverage.

* * * * * *
"Q Judge, in your capacity as having sat on this particular case and having decided the issues involved, was the denial of coverage by Central Mutual Insurance Company to Mr. Lezime Trahan on the question that this was a business venture excluded under the policy such a poor defense that it was worthy of no consideration whatsoever?

* * * * * *
"A Well, I considered very definitely that it was a serious defense. It was certainly not frivolous. That was a serious question about the status of the man, whether he was on a business venture or whether he was not and there was a serious question of the coverage, the language of the policy. I considered it certainly to be a serious question, both of them."
Another factor to be considered in determining whether Central Mutual's refusal to settle was arbitrary or capricious, was its third party demand against Nolan Edwards, the driver of the automobile, and his insurer. The facts were that Mr. Trahan's unlighted hay trailer, proceeding slowly down the highway at night, was struck from the rear by the Edwards automobile. In these cases, there is always a question of whether the motorist saw or should have seen the obstructing vehicle in time to stop. Of course, if Mr. Edwards had been found contributorily negligent, he could not have recovered damages for his own personal injuries and he and his insurer would have been liable for one-half of the damages suffered by the passengers. In this case, this would have meant that Central Mutual would not have had to pay its full policy limit.
I agree that the law is stated in Younger v. Lumbermen's Mutual Casualty Company, La.App., 174 So.2d 672 (3rd Cir. 1965, writ of certiorari refused). As to the first test laid down there, the majority decision herein concedes that Central Mutual was acting in good faith.
Of course, in Younger and the cases cited therein, there was no question of a coverage defense. The substantial issue was *196 whether the insurer was negligent in handling the defense and refusing a compromise. It is not even contended in the present case that Central Mutual was negligent in the manner in which it handled the defense on the liability issue.
The substantial question here is whether Central Mutual was arbitrary or capricious in refusing to settle. Clearly, it was not. It had a serious coverage defense. Central Mutual had a right to urge this defense without assuming the risk that if it lost it would have to pay the entire judgment. Under all of the facts, this was a reasonable position for Central Mutual's attorney to take. Certainly it was not so unreasonable as to justify the damages sought here.
For the reasons assigned, I respectfully dissent.

On Application for Rehearing.
En Banc. Rehearing denied.
CULPEPPER, J., and HOOD, J., are of the opinion a rehearing should be granted.