Breitel, J. (dissenting).
In an action by the receiver of an insured against his automobile liability carrier for negligence and breach of contract in refusing to defend or settle wrongful death and personal injury claims within policy limits, there are cross appeals. The receiver recovered, after a jury trial, compensatory damages of $201,129.17, equal to 1jhe excess judgments awarded in prior tort actions against the insured. Upon motion to the trial court an award of punitive damages in the additional amount of $300,000 was set aside. The Appellate Division, by a divided court, affirmed. The dissenters did not disagree with the findings of the carrier’s bad faith, but disagreed as to the measure of damages. The significant issues turn on the proper measure of damages, and alleged errors on requests to charge.
Plaintiff receiver had been appointed in supplementary proceedings to enforce the excess judgments recovered against the insured Porter, a former garage mechanic who apparently became unlocatable during the litigation. The receiver, in effect the judgment creditors, based his claims on the carrier’s breaches of duty towards its insured.
There should be a reversal and direction for a new trial. The court should not have charged that if liability is found the damages are measured as a matter of law by the amount of the excess judgments. Given the economic condition of the insured *442 the damages should have been realistically assessed by the jury under instructions setting forth the factors governing the damage sustained by the insured from the excess judgments rendered against him.
In August, 1961 Louis Porter, the insured, financed the annual renewal of his Nationwide automobile liability policy through the Premier Credit Corporation. On November 28, 1961 Porter’s 1953 sedan collided with the rear of a vehicle occupied by Mr. and Mrs. Botsettis and a passenger, Michael Panteloglu. The Botsettises died as a result of the accident and the passenger was severely injured. Porter, some six days later, notified Nationwide and attributed the rear-end collision to Mr. Botsettis, the driver of the impacted car. He also advised Nationwide that he had included the name of a witness to the accident in his report to the State Department of Motor Vehicles.
In December, 1961, Leon Greenspan, a lawyer representing the Botsettises ’ estates, wrote a claim letter to Porter who forwarded it to Nationwide. From December, 1961 to July, 1962 Mr. Greenspan made several proposals to settle all claims, including the Panteloglu claim, within the policy limits of $20,000. When no offer resulted, the estates sued Porter in July, 1962. He forwarded the papers to Nationwide. (Panteloglu sued about two years later.) After some delay and prodding by Mr. Greenspan Nationwide served an answer and demand for a bill of particulars in September, 1962. Again, Mr. Greenspan offered to settle for the policy limits. Nothing happened.
In November, 1962, 11 months after notice of the accident, Nationwide notified Porter and claimants’ lawyer that it was disclaiming because Porter’s finance company had sent a notice of cancellation dated and served November 10,1961, prior to the accident. The precipitating cause was Nationwide’s belated discovery in Porter’s file of a policy endorsement of financed premium and a purported notice of cancellation by the finance company. The endorsement empowered Nationwide to honor ‘ ‘ requests for cancellation ’ ’ tendered by the finance company. The endorsement continued: “If the Company cancels the policy it will be with advance notice to the Policyholder”. The notice of cancellation had been sent to Porter by the finance company, not Nationwide. Notably, the endorsement did not authorize the finance company to cancel but only to request *443 cancellation, nor did the notice comply with the statutory 13-day advance notice requirements (Banking Law, § 576, subd. 1, par. [b]; Johnson v. General Mut. Ins. Co., 24 N Y 2d 42, 48).
Claimants’ lawyer brought his objections to Nationwide’s attention, even citing a recent case (Cannon v. Merchants Mut. Ins. Co., 35 Misc 2d 625) directly in point as to the timeliness of the notice of cancellation. Nevertheless, Nationwide evidently never inspected the premium finance agreement nor investigated the basis for cancellation by the finance company. Indeed, the finance agreement, the only document ever signed by Porter, was not located by Nationwide until four years later. With respect to the timeliness of the notice, Nationwide’s lawyer admitted to claimants’ lawyer that the facts in the case, Cannon (35 Misc 2d 625, supra), were substantially identical but he disagreed with the holding. He also admitted on the trial that he had offered no contrary authorities. Finally, claimants’ lawyer asked Nationwide to bring a declaratory judgment action to resolve the matter, agreeing to withhold the claims until the issue was decided. Nationwide’s lawyer dismissed the suggestion.
Eventually, in December, 1962, Nationwide moved to withdraw from the case and the estates applied for inquests. Its lawyer reportedly agreed that if the estates would not oppose withdrawal, Nationwide would withdraw its answer and not object to inquests, stating: “ We don’t care what you do to our insured.”
The inquests followed and default judgments were entered against Porter on the Botsettises ’ claims for $179,462.50 and in a parallel litigation on the Panteloglu claim for $35,000. Notwithstanding the magnitude of the Botsettis judgments, Nationwide refused to consider claimants’ repeated proposal to settle all claims against Porter within policy limits. In an action severed from the present one the Botsettis claimants, in their own right under section 167 of the Insurance Law, recovered the policy limits from Nationwide (Rotsettis v. Nationwide Ins. Co., 58 Misc 2d 667). The conclusion in that action that the cancellation by the finance company was unauthorized and without proper notice was affirmed on appeal (31 A D 2d 722, mot. for lv. to app. den. 23 N Y 2d 646). As noted earlier, the present action was brought by a court- *444 appointed receiver in supplementary proceedings to enforce the Botsettis judgments against Porter, claiming on causes of action in his favor against Nationwide (see McKinney’s Cons. Laws of N. Y., Book 7B [1971 Cum. Sup.], Supplementary Practice Commentary by Professor David D. Siegel to CPLB 5201, p. 17, and CPLB 5228, p. 118; Matter of Kreloff v. Mendez, 65 Misc 2d 692, also involving an action by a receiver in supplementary proceedings and a refusal to defend or settle by Nationwide).
On the trial, to establish negligence and bad faith in Nationwide’s persistent refusal to defend or settle, witnesses called by plaintiff described the practice in the insurance industry. Gavin and Gochman each testified that it was industry practice to seek a declaratory judgment when a tort action is pending and a question of policy cancellation arises. Gochman stated that when disclaimer is based on cancellation it is customary to check the file for the notice of cancellation, and examine it for timeliness. Invariably when doubt as to cancellation arose, outside counsel would be retained to sue for a declaratory judgment. Even defendant’s expert,- Carroll, when informed upon cross-examination that notice had not been sent by Nationwide and a valid cancellation disputed, conceded that in a case as serious as this no carrier would abandon its insured.
The court charged the jury that they could find for the plaintiff if the insurer negligently or in bad faith abandoned the defense and refused at all times to consider a continuing opportunity to settle within policy limits ($20,000). As a matter of law damages were fixed by the court as the amount of the judgments in the personal injury and wrongful death cases, with credit for $13,333.33 paid in the section 167 action. The court refused to charge on contributory negligence, or to leave the assessment of damages to the jury. The jury returned a special verdict in favor of plaintiff receiver finding negligence and bad faith by the insurer and an award equal to the excess judgments. The jury’s award also included punitive damages for $300,000, which, as stated earlier, was stricken by the trial court on motion.
The insured’s contract claim is posited both upon a breach of the express covenant to defend and the implied covenant *445 of good faith, not to impair the insured’s interests. The doctrine that a liability insurer owes a duty of good faith to protect its insured, including the good faith consideration of opportunities to settle, because of its exclusive control in the management of claims has deep roots in New York (e.g., Best Bldg. Co. v. Employers’ Liab. Assur. Corp., 247 N. Y. 451, 453; Brassil v. Maryland Cas. Co., 210 N. Y. 235, 242; New York Cons. R. R. Co. v. Massachusetts Bonding & Ins. Co., 193 App. Div. 438, 444, affd. 233 N. Y. 547; Brunswick Realty Co. v. Frankfort Ins. Co., 99 Misc. 639, 642*; see Note, Recent Developments in the Excess Judgment Suit, 36 Brooklyn L. Rev. 464; Note, Excess Judgments and the Bad Faith Rule, 36 Albany L. Rev. 698). Indeed, a recent amendment of the Insurance Law imposes possible penalties upon insurers for “not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear ” (§ 40-d, as added by L. 1970, ch. 296, § 1).
Elsewhere it has been held that the insurer’s duty attaches to all aspects of a claim from investigating it, through good faith consideration of opportunities to settle it, to prosecuting appeals (Ann., Insurer’s Bad Defense—Liability, 34 ALR 3d 533; Ann., Liability Insurer—Refusal to Defend, 49 ALR 2d 694; Ann., Liability Insurer—Duty to Settle, 40 ALR 2d 168; Ann., Insurer’s Withdrawal From Defense, 167 A. L. R. 243). Indeed, at least one jurisdiction would go further and with respect to the insurer’s duty to settle would impose strict liability for refusal whether in good faith or not. The California Supreme Court, observing that it is the insured’s justifiable expectation that the entire coverage be utilized to effect a settlement, would apparently hold the insurer strictly accountable for any excess judgment when, at the time of refusal, there was a possibility however slight that a verdict would exceed coverage (Crisci v. Security Ins. Co., 66 Cal. 2d 425, *446 430-431; see, also, Marsango v. Automobile Club, 1 Cal. App. 3d 688; Trahan v. Central Mut. Ins. Co., 219 So. 2d 187, 192-193 [C.A., La.]; Herges v. Western Cas. & Sur. Co., 408 F. 2d 1157, 1161 [C.A., 8th]; Comment: Approaching Strict Liability of Insurer for Refusing to Settle Within Policy Limits, 47 Neb. L. Rev. 705; Comment: Insurer’s Strict Liability for Entire Judgment, 13 S. Dak. L. Rev. 375).
Significantly, the authorities discussed thus far are concerned with the insurer who defends but in doing so advanced its own interests by compromising those of its insured. In this case, Nationwide compounded the wrong by completely removing itself from the case. It thus denied the insured not only his express contract right to a defense but also the implied right to have settlements considered in good faith. The wrong is the more egregious, bad faith having been found and the finding virtually compelled by the record. The consequences should not be less than when the insurer defends and wrongfully ignores opportunities to settle. The courts, whenever confronted with the issue, so hold.
Trué, the unjustified refusal to defend, even if in bad faith, will not cast an insurer in damages for an excess judgment in the absence of a wasted opportunity to settle. Thus, damages are generally then limited to the policy coverage, counsel fees, and other expenses of litigation (1 Long, Law of Liability Insurance, § 5.05D, p. 5-41; Ann., Liability Insurer—Refusal to Defend, 49 ALR 2d 694, § 10). When, however, as in this case, there is the persisting proposal to settle much larger claims within policy limits, the damage rule is not so narrow. Then almost all courts agree that the insurer’s liability will extend to the excess judgment (e.g., Western Cas. & Sur. Co. v. Herman, 405 F. 2d 121 [C.A., 8th]; Seward v. State Farm Mut. Auto. Ins. Co., 392 F. 2d 723 [C.A., 5th]; Foundation Reserve Ins. Co. v. Kelly, 388 F. 2d 528 [C.A., 10th]; Landie v. Century Ind. Co., 390 S. W. 2d 558 [C.A., Mo.]; Comunale v. Traders & Gen. Ins. Co., 50 Cal. 2d 654; Southern Farm Bur. Cas. Ins. Co. v. Logan, 238 Miss. 580; Myers v. Farm Bur. Mut. Ins. Co., 14 Mich. App. 277; American Fid. Fire Ins. Co. v. Johnson, 177 So. 2d 679 [C.A., Fla.]; contra, Schurgast v. Schumann, 156 Conn. 471, 489-491; Mannheimer Bros. v. Kansas Cas. & Sur. Co., 149 Minn. 482, 485-487; see, generally, 1 *447 Long, op. cit., supra, pp. 5-42 to 5-44; Ann., Liability Insurer — Refusal to Defend, 49 ALR 2d 694, § 11).
In Seward v. State Farm Mut. Auto. Ins. Co. (392 F. 2d 723, supra) the insurer wrongfully refused to defend its insured in a wrongful death action. A default judgment was entered against the insured on the death claim for $57,000, an excess of $47,000 over policy limits. In the contract action by the insured against the insurer the issue was whether an insurer, failing to defend, is liable for the excess judgment in the absence of an opportunity to settle. The Federal Court of Appeals under constraint of the Florida cases reluctantly held that in addition to wrongful refusal to defend, an essential element was an opportunity to settle within policy limits. In the absence of a settlement proposal, under Florida law, the insurer could not be held liable for the excess judgment, because, the court said, ‘ ‘ An offer to settle, even if unknown to the insurer, is objective evidence of the connection between the insurer’s breach of contract and the amount of the damages ” (392 F. 2d, at p. 727).
In Comunale v. Traders & Gen. Ins. Co. (50 Cal. 2d 654, supra) the insurer had refused to defend its insured or to accept settlement proposals within policy limits. A judgment, $15,000 in excess of coverage, was recovered against the insured on the tort claim. The tort judgment creditors took an assignment of the insured’s cause of action against the insurer. The Supreme Court of California, in holding the insurer liable, stated:
" It is generally held that since the insurer has reserved control over the litigation and settlement it is liable for the entire amount of a judgment against the insured, including any portion in excess of the policy limits, if in the exercise of such control it is guilty of bad faith in refusing a settlement [citations omitted]. [Here], Traders never assumed control over the defense. However, the reason Traders was not in control of the litigation is that it wrongfully refused to defend Sloan, and the breach of its express obligation to defend did not release it from its implied duty to consider Sloan’s interest in the settlement.” (id., p. 660).
‘ ‘ An insurer who denies coverage does so at its own risk, and, although its position may not have been entirely ground *448 less, if the denial is found to be wrongful it is liable for the full amount which will compensate the insured for all the detriment caused by the insurer’s breach of the express and implied obligations of the contract. Certainly an insurer who not only rejected a reasonable offer of settlement but also wrongfully refused to defend should be in no better position than if it had assumed the defense and then declined to settle. The insurer should not be permitted to profit by its own wrong.” (id., p. 660) (see, also, Ralston and Ballard, Insurer’s Liability for Wrongful Refusal to Defend or Settle, 36 U. Mo. at K.C. L. Rev. 304).
In New York the consequences of an insurer’s bad faith refusal to defend, with or without an opportunity to settle, has not arisen often. True, there are easily distinguished cases in which damages have been limited to attorney’s fees and litigation expenses incurred by the insured (e.g., Brassil v. Maryland Cas. Co., 210 N. Y. 235, supra; Grand Union Co. v. General Ace., Fire & Life Assur. Corp., 2791 N. Y. 638; Goldberg v. Lumber Mut. Cas. Ins. Co., 297 N. Y. 148). But in every such case the insured had successfully defended the tort claim and no question of excess liability, therefore, arose. There were, in short, no excess tort judgments.
The rule regarding the insurer’s liability for wasted opportunities to settle as a result of bad faith withdrawal from the defense should be followed. Certainly, in the instance of a solvent insured who has been denied the valuable right to have his insurer consider a strategic settlement within policy limits, the insurer should be held responsible for all the consequences of its conduct, and the measure of that loss ordinarily would be the amount of the excess judgment, for exactly the reasons expressed by the California court (50 Cal. 2d 654, supra).
Nationwide does not quarrel with the general rule. Its position turns on the allegedly impecunious status of Porter, his alleged insolvency, and uncontradicted suggestions that he cannot be located. Prom these facts it urges that Porter sustained no harm from the excess judgments, and, therefore, his receiver should not recover damages automatically measured by the excess judgments.
Regardless of the insured’s financial responsibility most courts automatically adopt the excess judgment as the measure of damages in the insured’s contract action. In Lee v. *449 Nationwide Mut. Ins. Co. (286 F. 2d 295 [C.A., 4th]) the court rejected the view that the mere existence of an outstanding judgment, which may never be paid, is not legal injury. More acceptable, the court noted, ‘ ‘ is the view treating the extant, unpaid judgments as injuries in themselves, their overburden measuring the pecuniary damages” (id., at p. 298; accord, Smoot v. State Farm Mut. Auto. Ins. Co., 299 F. 2d 525, 530 [C.A, 5th]; Southern Farm Bur. Cas. Ins. Co., v. Mitchell, 312 F. 2d 485 [C.A., 8th]; Schwarts v. Norwich Union Ind. Co., 212 Wis. 593, 595; Henke v. Iowa Home Mut. Cas. Co., 250 Iowa 1123, 1141-1144; Sweeten v. National Mut. Ins. Co., 233 Md. 52, 56-57). That the insured was judgment proof or discharged in bankruptcy has been held not to affect recovery for the excess judgment (Southern Fire & Cas. Co. v. Norris, 35 Tenn. App. 657, 671-673; Young v. American Cas. Co., 416 F. 2d 906, 911-912 [C.A., 2d]; Robertson v. Hartford Acc. & Ind. Co., 333 F. Supp. 739; Brown v. Guarantee Ins. Co., 155 Cal. App. 2d 679, 689-693). In the Brown case the court noted that an insurer should not be able to use the limited financial responsibility of an insured to escape obligation, and that the excess judgment should set out the measure of damages (at pp. 690-691). The reasons for such a rule were best expressed in Gray v. Nationwide Mut. Ins. Co. (422 Pa. 500). To permit otherwise, the court observed, would allow insurers to benefit from the impecuniousness of an insured, encourage insurers to be less responsive to their contractual obligations, and overlook the basic economic fact that while the judgment remains outstanding the insured suffers “ real damage ” (id., at pp. 505-506; accord, Ammerman v. Farmers Ins. Exch., 22 Utah 2d 187, 189).
A few jurisdictions, some in distinguishable circumstances, have held that an insured is not injured and consequently suffers no damage by an uncollectible excess judgment (e.g., Dumas v. Hartford Acc. & Ind. Co., 92 N. H. 140, 141; see 1 Long, op. cit., supra, § 5.22). Recently the court in Bourget v. Government Employees Ins. Co. (456 F. 2d 282 [O.A., 2d, per Friendly, C. J.]) concluded that the estate of a deceased insured, insolvent at the time an excess judgment was entered, may not recover against the insurer for bad faith refusal to settle. The decision followed Harris v. Standard Acc. & Ins. Co. (297 F. 2d 627 [C.A., *450 2d], per Lombard, C. J., cert. den. 369 U. S. 843) involving an action by a trustee in bankruptcy of an insured insolvent at the time the excess judgment was recovered. The rule of these cases is evidently limited to insureds, dead and leaving no assets, or discharged in bankruptcy and insolvent at the time the excess judgment was rendered (see Young v. American Cas. Co., 416 F. 2d 906 [C.A., 2d], supra, involving a bankrupt, solvent at the time the excess judgment was recovered).
The situation of the insolvent, the deceased, or the bankrupt insured presents an obvious difficulty, in contrast to the solvent insured. In many instances, measuring the damages by the amount of the excess judgments, especially when they are as great as in this case, incurs judicial resistance, even as against a carrier which has beén proven to be grossly negligent and callously arrogant. Nevertheless, limiting damages to policy coverage and litigation expense, if any, incurred by an abandoned insured would be patently unjust. In most instances, if that were the rule, the carrier will not have risked more by its faithless conduct than it would have lost if it had performed its obligations faithfully. Moreover, it rewards the carrier for an irresponsible gamble, just because the insured is insolvent, dead, or bankrupt, a gamble that will often pay off, despite a breach of its duty to the insured and despite its indirect duty to the injured (see Insurance Law, § 167).
In the case of the insolvent, and in some instances, the deceased insured, there is no wholly satisfactory way to assess the economic harm wrought by the faithless carrier. This follows from the circumstance that as each increment of damage is paid, it becomes subject to the tort creditor’s claim, with an excess, albeit reduced, judgment liability still outstanding. The sequential effect is not ended until the excess judgment is wholly discharged. Nevertheless, in extreme cases, and this is such a one, the magnitude of the excess judgment may be so great as to make unjust liability up to its full amount. As a matter of probabilities there may be little or no chance that the insured could ever be vulnerable to a judgment of such size. As for bankruptcy, the submission to bankruptcy to avoid the excess judgment may be a significant loss for those who are sensitive or for those who have a reasonable likelihood of ever requiring *451 credit. Nevertheless, at least in the instance of judgments of great magnitude, there may be no realistic escape from bankruptcy.
The discussion thus far begins to elicit the economic factors which should influence the measure of damages. The factors would include the age, economic status, economic prospects, skills, health, and any other matters presently existing which would be reasonably predictive of the insured’s economic future, or that of his estate, if it were likely to receive assets or benefactions. The task is not easy, but it is not unusual (e.g., Duane Jones Co. v. Burke, 306 N. Y. 172, 192; MacGregor v. Watts, 254 App. Div. 904. These cases illustratively involved difficult projections of economic harm). A similar 'assessment is required when persons have been permanently injured or have been killed and the damage to their prospects or to their dependents is to be assessed (e.g., Houghkirk v. Delaware & Hudson Canal Co., 92 N. Y. 219, 223-225; Grayson v. Irvmar Realty Corp., 7 A D 2d 436; Dimitroff v. State of New York, 171 Misc. 635, 637-639; 13 N. Y. Jur., Damages, §§ 16 [at p. 441], 82-84).
Difficult or easy, such a rational and considered assessment is both fair and pragmatic. It is not as unfair as the imposition, automatically, of liability for the full amount of the excess judgment, even if it were a $1,000,000 judgment against an aged insured living on government beneficence, and suffering from a terminal illness. Nor is it as unfair as limiting recovery to the policy limits and litigation expense, if any, to a young person, impecunious in capital assets, but on the verge of embarking upon a professional or business career, to whom an overhanging judgment or bankruptcy might be an economic disaster.
Consequently, the better rule, in cases involving other than a solvent insured, would be for a trial court to instruct a jury with respect to the applicable factors, some of which have been suggested, bearing on the pecuniary and tangible harm done to the insured and assess that harm to include the economic harm to the insured now and in the reasonably anticipated future, of the overhanging excess judgment. Included, too, would be any other tangible harms, such as the loss of the right to operate motor vehicles or to obtain employment or insurance.
A further comment is suggested. The fact that this action is by the receiver in supplementary proceedings and that he is *452 the alter ego for the tort judgment creditors is of no moment. Judgment creditors may always reach the debtor’s assets. There is no reason why they may not reach an asset, the instant causes of action, just because they arose out of the transaction in which they were injured. It is perverse to urge that they may not. Moreover, ultimate compensation to the claimants is also the mechanism for removing or alleviating what the court in Lee v. Nationwide Mut. Ins. Co. (286 F. 2d 295, 298, supra) described as the 1 ‘ overburden ’ ’ sustained by the insured. Lastly, to reject recovery because behind the receiver stand the claimants as the real beneficiaries is to do violence to the statutes and principles extending remedies to judgment creditors, even tort judgment creditors.
Of course, the insured or his representative has the burden of persuasion on damages. He satisfies the burden, prima facie, by proving the amount of the excess tort judgment. The insurer may always show that in fact the insured was invulnerable or immune to the judgment, in whole or in part, because of his economic circumstances, or bankruptcy. The insured or his representative may then controvert the insurer’s evidence.
There are other issues, namely, alleged errors on requested charges by Nationwide regarding the defense of failure to mitigate damages and the insured’s contributory negligence.
Nationwide never pleaded by way of affirmative defense that Porter by not employing independent counsel to defend the wrongful death and personal injury actions failed to mitigate damages (CPLB 3018, subd. [b]; cf. McClelland v. Climax Housing Mills, 252 N. Y. 347, 352-353; Livant v. Livant, 18 A D 2d 383, 384-385; 3 Weinstein-Korn-Miller, N. Y. Civ. Prac., ¶¶ 3018-15 to 3018-18; Ann., Pleading—Tort — Mitigation of Damages, 75 ALB 2d 473, 479; 13 N. Y. Jur., Damages, § 26). Moreover, there is some doubt whether there is any duty, qualified or absolute, upon an insured to employ counsel after the insurer has wrongfully withdrawn (see Carthage Stone Co. v. Travelers Ins., 274 Mo. 537; In Re International Reinsurance Corp., 29 Del. Ch. 34, 78-79; cf. Seward v. State Farm Mut. Auto. Ins. Co., 392 F. 2d 723, 725, n. 4 [C.A., 5th], supra; Evans v. Continental Cas. Co., 40 Wn. 2d 614, 628; American Sur. Co. v. Sutherland, 35 F. Supp. 353, 358; but see Fidelity & Cas. Co. of N. Y. v. Gault, 196 F. 2d 329 [C.A., 5th]; Southern Farm Bur. *453 Cas. Ins. Co. v. Logan, 238 Miss. 580, supra; 1 Long, op. cit., supra, § 5.29.) In any event, Nationwide never carried its burden of showing that damages would in fact have been mitigated if counsel had been retained by Porter, whether in whole or in part, and that it would have been reasonable for a person in Porter’s financial condition, as Nationwide contends it was, to have done so. In the absence both of pleading and proving mitigation, the refusal to charge was proper.
On the other hand, it was wrong to refuse to charge on contributory negligence limited to the negligence cause of action. Receipt of notice of the insurer’s withdrawal and the claimants’ motion for inquests, and the December statement placing some of the blame for the accident upon the claimants, raised a question for the jury of Porter’s contributory negligence. As matters eventuated on the trial, it made no difference because of the concurrent full recovery on the contract cause of action.
Accordingly, I dissent and vote to reverse and order a new trial.
Judges Sctleppi and Jasen concur with Judge Bergan ; Chief Judge Fuld concurs in an opinion; Judge Breitel dissents in part and votes to reverse and grant a new trial in a separate opinion in which Judges Burke and Gtbson concur.
Order reversed, etc.

 An interesting variation arises when the insurer defending an action brought by an assignee of insured contends that in good faith in refusing to settle the tort action is relied on insured’s disclaimer of any responsibility for the accident. See Pipoli v. United States Fid. & Guar. Co. (38 A D 2d 249) in which the court was sharply divided. The instant case, of course, involves an affirmed finding that there was bad faith in the refusal to defend and the effect of the refusal to settle, which alone might or might not have constituted bad faith.